# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
June 19, 2002 Session

## STATE OF TENNESSEE v. ALAN E. MONDAY, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 62385     Richard R. Baumgartner, Judge**

_____

**No. E2001-01426-CCA-R3-CD**
**February 12, 2003**
_____

The appellant, Alan E. Monday, was convicted by a Knox County Criminal Court jury of reckless homicide in violation of Tennessee Code Annotated section 39-13-215 (1997). He was sentenced as a career offender to twelve years incarceration in the Tennessee Department of Correction. On appeal, the appellant contends (1) that the evidence was insufficient to convict the appellant of reckless homicide; (2) that the trial court erred in failing to require the prosecution to identify the reckless act upon which it relied; and (3) that the trial court erred in sentencing the appellant. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID H. WELLES, J., joined.

Kenneth F. Irvine, Jr., Knoxville, Tennessee, for the appellant, Alan E. Monday.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Robert L. Jolley, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Factual Background

In the early morning hours of September 30, 1996, Officer Larry Murrell of the Knoxville Police Department received a call regarding "a lady lying on the floor of the fourth floor" of the Parkway Hotel on Chapman Highway. Officer Murrell immediately proceeded to the hotel and was the first police officer to arrive at the scene. Because the elevator was not working, Officer Murrell climbed the stairs to the fourth floor. When Officer Murrell stepped into the hallway, he discovered the victim lying face down in a pool of blood near apartment 401. The victim, later identified as Beverly Reichenbach, was not moving and did not respond. A trail of blood led from the victim to apartment number 400. Officer Murrell secured the scene and waited for Officer Kathy Pappas to arrive.

Following the arrival of Officer Pappas, the two officers knocked on the door of apartment 400. Jack Monday, the appellant's brother, came to the door and allowed the officers inside the apartment. Officer Murrell noted that the apartment was in disarray. Based upon the condition of the apartment and his observations of the scene, Officer Murrell placed Jack Monday under arrest. Officer Murrell did not see the appellant that morning.

Officer Dan Crenshaw was employed as an evidence technician for the Knoxville Police Department in September 1996. On September 30, Officer Crenshaw was called to the Parkway Hotel on Chapman Highway. Upon arrival, Officer Crenshaw proceeded to the fourth floor where he observed the body of a white female lying on the floor. Noticing a trail of blood from the body to apartment 400, Officer Crenshaw entered the apartment. According to Officer Crenshaw, "the room was in disarray. There were beer cans all over the place. The coffee table was askew. There was some blood in the floor, a bullet in the floor. The whole room looked like a party had been going on there." A telephone was laying in the floor.

Officer Crenshaw also observed blood on the "middle rear or back cushion" of a sofa in the apartment. He turned over the "middle seat cushion" and discovered that it also had blood on it. Officer Crenshaw photographed the scene, noting a blood smear in the doorway of the apartment and an unfired .38 caliber bullet laying on the floor. He further noted the presence of brain matter on the floor of the apartment. Officer Crenshaw photographed a weapon which was found in the hotel parking lot, directly under an open bedroom window in apartment 400. He related that the weapon was not in one piece, explaining that "the grips were, approximately five feet away, and the frame was bent." Officer Crenshaw returned to the apartment one to two hours later to ensure that no evidence had been missed. On his return trip to the apartment, Officer Crenshaw opened the sofa bed and discovered a live .38 caliber bullet and a stain that appeared to be blood. However, no testing was conducted to confirm that the substance was blood.

The next day, Officer Crenshaw went to the University of Tennessee hospital to observe the autopsy of the victim. However, he discovered that the autopsy had been completed prior to his arrival. Nevertheless, Officer Crenshaw photographed the victim's body, including the gunshot wound to the victim's head. Fingernail clippings were taken from the victim; however, no testing was conducted on the clippings. Officer Crenshaw also did "atomic absorption" testing on the hands of the appellant and Jack Monday. These tests were not sent for analysis because the subjects had washed their hands, making any results unreliable.

On September 30, 1996, Sergeant Dick Evans of the Knoxville Police Department was the "street supervisor in patrol." When Sergeant Evans arrived at the Parkway Hotel, the body of the victim was still in the hallway, but it had been covered. As Sergeant Evans stood in the hallway, he heard something behind him. Turning, he saw a white male coming up the steps. At trial, Sergeant Evans identified the appellant as the individual he saw that day. According to Sergeant Evans, the appellant appeared to be nervous. Sergeant Evans asked the appellant, "Where are you going?" The appellant responded, "I am looking for my girlfriend." The appellant related that he lived in the hotel and that his name was Alan. The appellant then said, "She shot herself.

She is a dope head, f---ing everybody." He further related, "She is mad at me, because she caught me with another woman." Sergeant Evans estimated that his conversation with the appellant lasted less than one minute. Shortly thereafter, the appellant was handcuffed and placed in a patrol car. The appellant continued "ranting on about the victim, and his brother, and him. He made one statement that, 'My brother didn't have anything to do with it.'"

Sergeant Evans transported the appellant to the third floor of the police department. Upon arrival, the appellant stated that he had to use the restroom. Accordingly, Sergeant Evans took the appellant to the restroom. As they entered the restroom, the appellant pushed past Sergeant Evans and attempted to wash his hands. Later, the appellant stated that his stomach was upset and again asked to go to the restroom. Once again, the appellant tried to wash his hands. The appellant also attempted to get to the water fountain.

Sheila Miller lived in apartment number 4 of the Parkway Hotel. Miller had seen the appellant around the hotel, but she did not know him personally. During the early morning hours of September 30, 1996, Miller was awakened by what she believed to be gunshots. Miller then heard "a lot of running through the hallway. It was just like a stampede coming through the hallway, and they were hitting the stairwell." Miller heard glass shatter and looked out her window, noticing a van outside. The van "just took off -- just flew." Next, Miller heard someone say, "[G]od forgive me -- Goddamn." Another voice responded, "you didn't have to kill her, man." Miller did not recognize the voices. She attempted to look into the hallway through the peephole of her door, but she was unable to see anything. However, she heard, "Just like dragging something. And then all of a sudden I heard a bang on the door, and it was the gentleman that lived across the hall from me."

Shortly thereafter, Miller heard someone banging on a door and heard her neighbor, Leonard Parrott, say, "I can't help you, man." Parrott then slammed his door. Miller was afraid and remained in her apartment. A short time later, Miller's friend, Sharon Kent, came to Miller's apartment. When Miller and Kent left the apartment, Miller saw the victim's body in the hallway.[1] The appellant was standing over the victim. He was wearing a pair of boots, jeans, and a belt, but he was not wearing a shirt. The appellant had blood on his chest and on his hands. According to Miller, the appellant "just looked like he was in another world." Two days later, Miller was in the lobby of the hotel when she observed the appellant talking with two individuals. Miller stated that "they were just goofing off. They looked like they had been on a drunk. They were still drunk, . . . and they were laughing and carrying on." Miller heard the appellant say, "Yeah, I did them a damn favor. . . . Just another whore off the damn street." Miller conceded that when initially questioned by police, she did not disclose that she had overheard this conversation, explaining that she feared she would be evicted from the hotel.

Thomas Michael Pressley, a criminal investigator with the Knoxville Police Department, was assigned to the Major Crimes Unit in 1996 and investigated the shooting of Beverly Reichenbach. On the day of the offense, Investigator Pressley viewed the crime scene at the Parkway

---

[1] Sharon Kent died prior to the appellant's trial.

Hotel and proceeded to police headquarters where he spoke with the appellant. Investigator Pressley advised the appellant of his Miranda rights and the appellant executed a waiver of his rights. The appellant then gave eight different versions of the events surrounding the offense. The appellant stated that he committed the homicide; that the victim committed suicide; that he was in the laundry room and not even present when the shooting occurred; that the victim was involved in a "drug rip-off and some black men" shot her; that he was innocent and so was his brother; that the victim was involved with crack cocaine dealers; that the victim shot herself; and that the victim had been killed by a "Mexican whore." The appellant maintained that he loved the victim and would not do anything to harm her.

At trial, Investigator Pressley identified a photograph of the appellant's back. The photograph was taken on the day of the offense and depicted scratches on the appellant's back. Investigator Pressley also related that the appellant had what appeared to be blood on his pants and boot. Investigator Pressley noted that the appellant smelled of alcohol and talked about his use of drugs. Nevertheless, several hours after the appellant was placed in custody, he was released. The appellant voluntarily returned to speak with Investigator Presley on several occasions. The appellant also consented to blood testing and gunshot residue testing.

On October 3, 1996, the appellant was interviewed by Officer Gary Anders of the Knoxville Police Department. The appellant told Officer Anders that shortly before the shooting, the victim was sitting on a couch in his apartment. The appellant noticed a gun in the victim's purse or between the cushions of the couch. As the appellant reached down to grab the gun, the victim grabbed the weapon. They struggled over the weapon and the appellant surmised that his finger must have pulled the trigger. The gun discharged, striking the victim.

Around 3:00 a.m. on September 30, 1996, Officer Kathy Pappas of the Knoxville Police Department responded to a call to the Parkway Hotel "that a female was down and had blood on her face." Upon arrival, Officer Pappas spoke immediately with emergency medical personnel who advised her that the victim was "hurt pretty bad." Officer Pappas then joined Officer Murrell and the officers knocked on the door of apartment 400. The appellant's brother, Jack Monday, responded to their knock. The officers entered the apartment, handcuffed Jack Monday, and advised him of his rights. Officer Pappas noted that the apartment appeared to have been "ransacked." Several items, including ashtrays, were overturned. A telephone laying in the middle of the room had ashes on it and the receiver was off the hook. Following the officers' request that he be seated, Jack Monday sat on the middle cushion of the couch. Later, when the cushion was turned over, Officer Pappas observed blood, brain matter, and bone fragments on the cushion. A syringe and a purse belonging to the victim were found inside the apartment. A continuous trail of blood led from the victim's body to apartment 400.

Captain Gordon Catlett, Jr., was employed as a lieutenant in the Central District Patrol Division of the Knoxville Police Department on September 30, 1996. Captain Catlett also responded to the call at the Parkway Hotel. When Captain Catlett arrived, he was advised by paramedics that the victim had a gunshot wound to the head. Captain Catlett noticed a "blood

smear" from the victim's body to apartment 400 and observed Officers Compton and Murrell speaking with an individual inside apartment 400. Captain Catlett saw an "area of blood on the rug immediately inside the apartment." Captain Catlett found the apartment in disarray, "things knocked off tables, ashes in the floor, cigarette butts in the floor. And also there was a .38 caliber shell lying in the immediate entranceway on the rug in the apartment."

Captain Catlett told the two officers to advise Jack Monday of his rights, then stepped back into the hallway. There, Captain Catlett encountered the appellant who was wearing jeans and cowboy boots, but no shirt. When Captain Catlett approached the appellant, the appellant spontaneously remarked, "Well, here I am." In response to Captain Catlett's question as to what had transpired, the appellant responded, "Well, she shot herself." Initially, the appellant advised Captain Catlett that the gun could be found in the victim's hand. After being told that there was nothing in the victim's hand, the appellant then stated that the weapon was in the victim's boot; however, the victim was wearing tennis shoes. Finally, the appellant stated that the gun was laying under the victim. As a result of the appellant's actions, Captain Catlett advised the appellant to turn around and place his hands on the wall. Immediately, the officer observed "claw marks" on the appellant's back. Captain Catlett testified that

> [the claw marks] looked fresh, because they were still pinkish red.
> You know he didn't have a shirt on. When I say claw marks, it would
> be starting from the center of the back spreading out . . . like an open
> hand had got ahold of him and had clawed his arms and his . . . back.

The appellant also had a bloodstain on the back of his right hand. Captain Catlett placed the appellant under arrest and turned him over to Sergeant Evans.

Shortly thereafter, while searching for the weapon, Captain Catlett noticed an open window in apartment 400. The window overlooked the hotel parking lot. Captain Catlett went outside into the parking lot where he discovered a .38 caliber handgun. The weapon had apparently broken upon striking the pavement and the grips were missing. However, the grips were soon located nearby.

Dr. Paul Googe performed the autopsy on the victim. At trial, Dr. Googe testified that the thirty-six-year-old victim died as the result of a large caliber gunshot wound to the head. Dr. Googe related that the victim had some bruising and broken fingernails, and he also noted evidence of recent intravenous drug use. Significantly, he did not find the presence of stippling near the wound. Therefore, Dr. Googe concluded that the bullet was fired some distance from the victim's face. He described the direction of the bullet as "straight in from the place that it was located until it hit the back of the skull." Toxicology reports indicated that the victim had a blood alcohol level of .22 grams per deciliter. Cocaine, promethazine, and meprobamate were also present in the victim's body.

Leonard Charles Parrott testified at trial on behalf of the appellant. On September 30, 1996, Parrott was living in apartments 403 and 405 at the Parkway Hotel. At approximately 3:00 a.m., the appellant knocked on Parrott's door and asked Parrott to call 911. Parrott testified that the

appellant was "in a panic, scared." Parrott observed the victim lying face down on the floor in the hallway. The appellant told Parrott that he was trying to get the victim to the hospital. Parrott immediately called 911 for assistance. On cross-examination, Parrott denied that soon after the offense, he gave police a statement in which he alleged that the appellant had told him, "it was over a pistol."

At trial, Jack Monday testified on behalf of the appellant. Monday had known the victim for six or seven years prior to her death. On September 29, 1996, at approximately 6:30 p.m., the victim telephoned Monday and asked him to "come and get her." Monday refused because he had been drinking and because he knew the victim was "doing drugs." Later that night, the victim again called Monday. Monday related that during his telephone conversations with the victim, she was crying and threatening suicide. Because of his concerns for the victim, Monday told the victim to arrange for a cab to bring her to the apartment and he would pay the fare. The victim arrived at Monday's apartment around 8:00 p.m. Monday consoled the victim and continued drinking beer. He also took a muscle relaxer provided to him by the victim. Eventually, around midnight, Monday passed out on the couch. His next memory was being awakened by police entering his apartment.

On cross-examination, Monday stated that the victim was a friend and had previously been the appellant's girlfriend. Monday denied that the victim had ever been his girlfriend, but admitted that on the night of the offense he had sexual relations with the victim. Monday explained that the victim was upset when she arrived at the apartment, so Monday suggested that they "go fool around. Maybe it will make you feel better." Acknowledging that his efforts were not completely successful, Monday related that approximately an hour and a half later, the victim again became upset. She then went into the bathroom and "injected herself with cocaine."

Monday testified that the gun used to kill the victim had been stored in a bedroom in his apartment. He stated that the weapon belonged to the victim but was kept in his apartment. However, the appellant knew where the gun was stored.

Based on the foregoing evidence, the jury convicted the appellant of one count of reckless homicide and the appellant timely appealed.

## II. Analysis

A. Sufficiency of the Evidence

First, the appellant contends that the evidence is not sufficient to support the conviction of reckless homicide. In Tennessee, appellate courts afford considerable weight to the verdict of the jury in a criminal trial. In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). When an appellant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990). These standards apply to convictions based upon direct evidence, circumstantial evidence, or both. State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000); State v. Vann, 976 S.W.2d 93, 111-12 (Tenn. 1998) (appendix). However, if the State's evidence is wholly circumstantial, the State, at trial, must "'exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998) (appendix) (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)).

The appellant was charged with the reckless homicide of Beverly Reichenbach. Reckless homicide is "a reckless killing of another." Tenn. Code Ann. § 39-13-215. Tennessee Code Annotated section 39-11-302(c) (1997) defines "reckless" as:

> act[ing] recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

When viewed in the light most favorable to the State, the proof establishes that the appellant recklessly killed the victim. The appellant contends that the State's proof is merely speculative and is based solely upon circumstantial evidence. He contends that the testimony of Sheila Miller is inconsistent and contradictory. Further, the appellant alleges that the State did not prove the reckless act which resulted in the victim's death. We respectfully disagree.

First, we note that although the State's proof was based primarily on circumstantial evidence, there was direct and circumstantial evidence of the appellant's guilt. In one of his statements, the appellant told Officer Pressley that he killed the victim. The appellant related that he and the victim struggled over the gun and that his finger "must have pulled the trigger." Moreover, Sheila Miller testified that she overheard the appellant say, "Yeah, I did them a damn favor. . . . Just another whore off the damn street." When the appellant was arrested, he had claw marks on his back and what appeared to be blood on his pants and boot. The appellant, his brother, Jack Monday, and the victim were the only people present in the apartment at the time of the shooting. The appellant told Sergeant Evans that his brother was not involved in the shooting. At trial, the defense vigorously emphasized the inconsistencies in the statements of Sheila Miller,

raising questions regarding her credibility. Although the appellant claimed that he was only trying to prevent the victim's suicide, the jury, as they were free to do, obviously rejected the appellant's version of events. This issue is without merit.

B. Bill of Particulars

Next, the appellant contends that the trial court erred by refusing to grant his motion for a bill of particulars, thereby preventing him from adequately defending himself at trial. Specifically, the appellant argues that the State should have been required to disclose the reckless act committed by the appellant which led to the death of Beverly Reichenbach.

Tennessee Rule of Criminal Procedure 7(c) provides that, "[u]pon motion of the defendant the court may direct the filing of a bill of particulars so as to adequately identify the offense charged." The decision whether to order a bill of particulars lies in the discretion of the trial court, and this court will not reverse the trial court's denial of a bill of particulars absent a showing that the trial court abused its discretion. State v. Judy C. Leath, No. 01C01-9511-CC-00393, 1998 Tenn. Crim. App. LEXIS 180, at *13 (Nashville, Feb. 10, 1998) (citing State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994)).[2]

The purposes of a bill of particulars are three-fold: (1) to provide the defendant with information about the details of the charge if this is necessary to the preparation of the defense; (2) to avoid prejudicial surprise at trial; and (3) to enable the defendant to preserve a claim of double jeopardy. State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991). The Advisory Commission Comments to Rule 7(c) state that the purpose of the bill of particulars is to enable the defendant to know "precisely what he or she is charged with." It is not meant to be used for the purposes of broad discovery. Tenn. R. Crim. P. 7(c), Advisory Commission Comments; see also Stephenson, 878 S.W.2d at 539.

"'The test in passing on a motion for a bill of particulars should be whether it is necessary that [the] defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided.'" State v. Hicks, 666 S.W.2d 54, 56 (Tenn. 1984) (quoting 1 C. Wright, Federal Practice and Procedure, Criminal, § 129 (1982)). If the needed information is in the indictment or has been provided by the State in some other satisfactory form, no bill of particulars is required. Id. A bill of particulars is not intended to be a means of learning the State's evidence and theories, although to the extent the information sought is necessary, it will be required, even if to do so discloses the State's evidence or theories. Id.

The indictment in the instant case alleged that the appellant "[o]n or about the 30th day of September, 1996, in the State and County aforesaid, did unlawfully and recklessly kill Beverly Reichenbach, in violation of T.C.A. 39-13-215 . . . ." Although the appellant argues that the State

---

[2] The record before this court does not contain an order or transcript of the trial court's ruling on the appellant's motion for a bill of particulars. However, the issue was discussed during the hearing on the motion for new trial. A transcript of that hearing is a part of the record.

failed to allege the reckless act which led to the victim's death, we note that the presentment was sufficient under the standards set forth in State v. Hill, 954 S.W.2d 725 (Tenn. 1997). The presentment set forth the elements of the offense, making specific reference to the applicable statute; it "enable[d] the accused to know the accusation to which answer [was] required;" and it protected against double jeopardy as it alleged that the event occurred on a specific date and against a specific victim. Id. at 727; see also State v. Sledge, 15 S.W.3d 93, 95 (Tenn. 2000).

Moreover, the appellant provided no specific evidence withheld by the State which surprised him, nor has the appellant shown how he was prejudiced. To the contrary, the record reflects that the appellant was familiar with the State's evidence and theory of the case. The record reflects numerous references to a federal court trial involving charges arising out of the same offense.[3] During the trial in the instant case, the appellant thoroughly cross-examined numerous witnesses regarding inconsistencies in their testimony, both in prior statements and during their previous testimony in federal court. The appellant's theory of defense was that the appellant and the victim struggled over a gun and the victim was accidentally shot. Although the appellant provided eight different versions of the events leading to the victim's death, he consistently stated that the victim was shot. Again, the appellant has not shown that he was surprised by any of the evidence or that he was unable to adequately prepare his defense. This issue is without merit.

C. Sentencing
The appellant also contends that the trial court erred in sentencing. The appellant was sentenced as a career offender to twelve years incarceration. At the sentencing hearing, the State introduced certified copies of documents reflecting that the appellant had ten prior felony convictions. The appellant asserts that, because the names on the documents were not identical, the State failed to prove beyond a reasonable doubt that the appellant had the requisite number of prior felonies for classification as a career offender.[4] Additionally, the appellant contends that the State failed to show that the conviction for petit larceny was a felony. Therefore, the appellant argues that only three of the prior convictions introduced by the State should have been considered by the trial court. Accordingly, the appellant asserts that he should have been sentenced as a multiple offender with a sentencing range of four to eight years.

Tennessee Code Annotated section 40-35-108(a)(3) (1997) defines a "career offender" as a defendant who has received "[a]t least six (6) prior felony convictions of any classification if the defendant's conviction is a Class D or E felony." "A defendant who is found by the court beyond a reasonable doubt to be a career offender shall receive the maximum sentence within the applicable Range III." Tenn. Code Ann. § 40-35-108(c). Tennessee Code Annotated section 40-35-202(a) (1997) provides in pertinent part that certified copies of court records bearing the same name as that by which a defendant is charged are admissible to show prior felony

---

[3] In June 1999, the appellant was convicted in federal court on charges of being a felon in possession of a firearm. The federal court charges stemmed from the events of September 30, 1996.

[4] The various documents contained the following names, "Allen E. Monday," "Alan Eugene Monday," "Allen Monday," and "Steve Allen Monday."

convictions. Such evidence is "prima facie evidence that the defendant named therein is the same as the defendant before the court." Id.

The appellant was convicted of reckless homicide, a Class D felony. See Tenn. Code Ann. § 39-13-215. At the sentencing hearing, the State offered certified copies of judgments and court minutes to establish the following prior felony convictions:

| Conviction | Date | Name | Offense |
|---|---|---|---|
| 1. C2691, Knox County | 4/1/1977 | Allen E. Monday | Second Degree Burglary |
| 2. 12989, Knox County | 5/26/1982 | Alan Eugene Monday | Petit Larceny |
| 3. 15268,[5] Knox County | 2/18/1983 | Allen Monday | Receiving Stolen Property Over $200 |
| 4. 15269, Knox County | 2/18/1983 | Steve Allen Monday | First Degree Burglary |
| 5. 15270, Knox County | 2/18/1983 | Allen Monday | First Degree Burglary |
| 6. 15271, Knox County | 2/18/1983 | Allen Monday | Receiving Stolen Property Over $200 |
| 7. 15272, Knox County | 2/18/1983 | Allen Monday | Receiving Stolen Property Over $200 |
| 8. 15273, Knox County | 2/18/1983 | Allen Monday | Receiving Stolen Property Over $200 |
| 9. 51537, Knox County | 3/18/1994 | Alan Monday | Violation of Habitual Motor Vehicle Offender Law |
| 10. 54733, Knox County | 3/18/1994 | Alan Eugene Monday | Violation of Habitual Motor Vehicle Offender Law |

The defense challenged the State's introduction of evidence of these convictions. During the sentencing hearing, the following colloquy occurred between the trial court and the appellant's counsel:

---

[5] In cases 15268 through 15273, the State also introduced a copy of the transcript of the guilty plea hearing, styled State of Tennessee v. Allen E. Monday, reflecting that the appellant entered guilty pleas to each of these offenses. Moreover, at the sentencing hearing in the instant case, it was established that the offenses in cases 15268 through 15273 were not committed as part of a single course of conduct within twenty-four hours so as to constitute only one felony conviction. See Tenn. Code Ann. § 40-35-108(b)(4).

The Court:   Are you claiming that the person that they have introduced the convictions for is not the individual who is seated over here on my right?

Counsel:  Your Honor, I am saying they have not met their burden that they have to meet; that the statute and the case law says that they are allowed to put them in, but it has to be in the same name. . . . There is nothing in those documents where the name is different that further identifies the individual involved in that case.

The Court:  I am asking you again: Are you saying that the individual who they have introduced proof of having these convictions is not the individual seated here in the courtroom?

Counsel:  Your Honor, I was not present at those.  I can't answer that question.

As noted, documents were introduced evidencing nine convictions in which the defendant is identified as Allen E. Monday, Alan Eugene Monday, or Alan Monday. One document, the court minutes in case number 15269, identifies the defendant as Steve Allen Monday.  In sum, the issue raised by the appellant is whether these names can be considered the same for the purpose of classifying the appellant as a career offender.  This court noted in State v. Jones, 733 S.W.2d 517, 521 (Tenn. Crim. App. 1987) (citation omitted),

> [t]he doctrine of "idem sonans" provides that if the name, as spelled in a legal document, though different from the correct spelling, conveys to the ear, when pronounced according to the commonly accepted methods, a sound practically identical with the correct name as commonly pronounced, the name thus given is a sufficient designation of the individual to which reference is made, and no advantage can be taken of a clerical error.  Accuracy in the spelling of the defendant's name is not required when basically the same sound is preserved and there is no uncertainty in the description or identity of the two names.  Furthermore, an abbreviation of the defendant's name is permissible.

The trial court determined that the State had introduced adequate proof regarding the number of prior convictions. We agree.  First, as the State correctly noted at the sentencing hearing, for the purpose of determining classification of offenses, the appellant's 1982 conviction of petit larceny was to be considered as a Class E felony.  See Tenn. Code Ann. § 40-35-118.  As to the appellant's claim that the court minutes introduced as proof of conviction in case number 15269 do not meet the standard of beyond a reasonable doubt, we agree.  However, the State introduced additional proof to support the conviction.  In addition to the court minutes, the State introduced a transcript of the guilty plea hearing reflecting that Allen E. Monday plead guilty to first degree

burglary in case number 15269. Regardless, even without the disputed convictions, the proof was sufficient to show that the appellant had the requisite six (6) prior felony convictions for classification as a career offender. This issue is without merit.

### III.  Conclusion

In summary, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE